UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAURIE BLEVINS,

       Plaintiff,                         Hon. Ellen S. Carmody

v.

                                            Case No. 1:10-cv-1252

COMMISSIONER OF
SOCIAL SECURITY,

       Defendant.

_____/

## **OPINION**

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Social Security Act. On March 14, 2011, the parties agreed to proceed in this Court for all further proceedings, including an order of final judgment. (Dkt. #8).

        Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is not supported by substantial evidence. Accordingly, the Commissioner's decision is **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

1

## **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted).  This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 47 years old at the time of the ALJ's decision.  (Tr. 25, 159).  She successfully completed high school and worked previously as a machine operator and assistant manager.  (Tr. 23, 165).

Plaintiff applied for benefits on November 3, 2006, alleging that she had been disabled since October 28, 2006, due to back problems, depression, seizures, multiple sclerosis, and leukoencephalopathy.  (Tr. 16, 163).  Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 68-133).  On July 9, 2009, Plaintiff appeared before ALJ Lawrence Blatnik, with testimony being offered by Plaintiff and vocational expert, Sandra Steele.  (Tr. 26-67).  In a written decision dated September 16, 2009, the ALJ determined that Plaintiff was not disabled.  (Tr. 16-25).  The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter.  (Tr. 1-5).  Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on December 31, 2007.  (Tr. 18).  To be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must establish that she became disabled prior to the expiration of her insured status.  *See* 42 U.S.C. § 423; *Moon v.*

*Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## **RELEVANT MEDICAL HISTORY**

The results of January 11, 2005 MRI of Plaintiff's brain were "consistent with demyelination[1] with mild increasing signal abnormality." (Tr. 281).

On October 19, 2005, Plaintiff was examined by Dr. Daniel Mikol at the University of Michigan Multiple Sclerosis Center. (Tr. 258-61). The doctor examined the results of a January 2005 MRI examination of Plaintiff's brain as well as "a comparison study from 2003." (Tr. 260). The doctor concluded the following:

> Considering the clinical picture as well as the patient's MRI findings, there is concern for the possibility of CADASIL,[2] and less likely a leukodystrophy[3] or mitochondrial disorder. Even less likely given the degree of MRI change, is antiphospholipid antibody syndrome. Neither the clinical course nor radiographic findings suggest multiple sclerosis. We feel that we cannot make a definitive diagnosis at this time, however, as much is unknown about prior work-up. Further testing needs to be done.

(Tr. 260).

On March 13, 2006, Plaintiff was examined by Dr. John Fink at the University of Michigan Neurogenetics Clinic. (Tr. 262-64). After administering a physical examination, the

---

[1] Demyelination is the "destructive removal of myelin, an insulating and protective fatty protein which sheaths nerve cells (neurons)." *See* Demyelination, available at http://www.mult-sclerosis.org/demyelination.html (last visited on March 26, 2012).

[2] CADASIL is "an inherited form of cerebrovascular disease that occurs when the thickening of blood vessel walls blocks the flow of blood to the brain." *See* What is CADASIL, available at http://www.ninds.nih.gov/disorders/cadasil/CADASIL.htm (last visited on March 26, 2012).

[3] Leukodystrophy refers to "progressive degeneration of the white matter of the brain due to imperfect growth or development of the myelin sheath, the fatty covering that acts as an insulator around nerve fiber." *See* What is Leukodystrophy, available at http://www.ninds.nih.gov/disorders/leukodystrophy/leukodystrophy.htm (last visited on March 26, 2012).

results of which were unremarkable, and reviewing the results of an MRI examination, the doctor concluded that:

> [Plaintiff] is a 44-year-old with a slowly progressive leukoencephalopathy. We believe this is most likely on a genetic basis. We are much less than inclined to think that this is an acquired demyelinating condition like multiple sclerosis. Given the disparity between her clinical appearance and the MRI scan, we would favor at this time the possibilities of CADASIL or vanishing white matter disease.[4]

(Tr. 263-64).

On May 21, 2006, Plaintiff participated in an intracranial MR angiogram examination the results of which revealed that "the intracranial arteries are unremarkable, without focal stenosis, and without evidence for aneurism." (Tr. 272). However, the examination revealed "cerebral atrophy with severe periventricular and subcortical white matter disease." (Tr. 272).

On May 25, 2006, Plaintiff participated in an MRI examination of her brain the results of which revealed findings "consistent with [Plaintiff's] history of demyelinating disease." (Tr. 303). Plaintiff also participated in an MRI examination of her spinal cord the results of which revealed: (1) moderate degenerative disc height loss at C5-6; (2) a "small" disc herniation at C6-7 "resulting in impingement of the exiting left C7 nerve root"; (3) "stable" degenerative joint disease at C5-6 and C6-7; and (4) a "tiny" disc herniation at C3-4. (Tr. 241-43).

On June 5, 2006, Plaintiff was examined by Dr. Gurmail Dhaliwal. (Tr. 246-47). Plaintiff reported that she was experiencing "cramps in her legs all of the time for many years." (Tr.

---

[4] Leukoencephalopathy with vanishing white matter is a progressive disorder that mainly affects the brain and spinal cord (i.e., the central nervous system). *See* Leukoencephalopathy with Vanishing White Matter, available at http://ghr.nlm.nih.gov/condition/leukoencephalopathy-with-vanishing-white-matter (last visited on March 26, 2012). Progression of this disorder "is generally uneven, with periods of relative stability interrupted by episodes of rapid decline." *Id.*

246). An examination revealed "no abnormal movements...no wasting...no weakness...good pedal pulses...[and] normal soft touch, pinprick and vibration sense in the lower limbs." (Tr. 246). Plaintiff also participated in an EMG examination the results of which were "normal" with "no evidence of peripheral neuropathy, motor radiculopathy or any other lower motor neuron pathology." (Tr. 246-47). On June 15, 2006, Plaintiff participated in an electroencephalogram examination the results of which were "within normal limits." (Tr. 248).

On June 20, 2006, Plaintiff was examined by Dr. Eric Eggenberger. (Tr. 214-19). Plaintiff reported that she was experiencing sweats, anorexia, fatigue/weakness, sleep disorder, blurry vision, syncope, nausea, vomiting, back pain, muscle weakness, stiffness, paresthesias, headaches, and depression. (Tr. 215-16). Based on the results of a January 2003 MRI examination, the doctor diagnosed Plaintiff with leukoencephalopathy. (Tr. 218).

On December 22, 2006, Plaintiff completed a report regarding her activities. (Tr. 179-86). Plaintiff reported that she cares for her children and the family pets. (Tr. 180). Plaintiff reported that she prepares meals, washes dishes, dusts, vacuums, and washes laundry. (Tr. 181). Plaintiff also reported that she enjoys reading, knitting, and crocheting. (Tr. 183).

On January 26, 2007, Plaintiff participated in an MRI examination of her lumbar spine the results of which revealed "multilevel degenerative changes, worse at the L4-5 level where there is a broad disc bulge" and "moderate right neural foraminal narrowing." (Tr. 690-91). X-rays of Plaintiff's lumbosacral spine, taken the same day, revealed "mild degenerative disc changes at the lower lumbar levels, not significantly changed since 5-10-06" and "facet degenerative changes suspected at the lumbosacral junction, stable." (Tr. 692).

On April 26, 2007, Plaintiff was examined by Dr. Kermith Scarlett. (Tr. 701).

Plaintiff reported that she was "experiencing pain all over her body." (Tr. 701). An examination revealed that Plaintiff was experiencing pain in her neck, shoulders, elbows, hips, knees, and ankles "with some tightness and some problems functioning." (Tr. 701). The doctor also observed that the joints of Plaintiff's fingers were "inflamed." (Tr. 701). Dr. Scarlett concluded that Plaintiff was "experiencing an acute flare up of osteoarthritis in the joints of her body." (Tr. 701).

On August 24, 2007, Plaintiff was examined by Dr. Scarlett. (Tr. 705-06). Plaintiff reported that she was experiencing low back pain. (Tr. 705). An examination revealed that Plaintiff was experiencing "severe rotor scoliosis to the right with the right hip and low back being twisted out of place." (Tr. 705). The doctor also reported that Plaintiff "is walking abnormally and is experiencing pain in the low back with decreased [range of motion] to forward flexion, extension, rotation and side bending bilaterally with severe difficulty." (Tr. 705).

Treatment notes dated September 11, 2007, reveal that Plaintiff "has a severe dorsal lumbar scoliosis with a concavity to the right and the right sacrum and hip are being pushed towards the right and out of place with pain in the low back." (Tr. 707).

On September 13, 2007, Plaintiff was examined by Dr. Yasushi Kisanuki at the University of Michigan Neurogenetics Clinic. (Tr. 521-24). Plaintiff reported that her migraine headaches were "relatively controlled" with medication. (Tr. 521). As for her lower back and lower extremity pain, Plaintiff reported that her medication "significantly improves" her pain. (Tr. 521). The doctor noted that the results of a recent skin biopsy examination were "negative for CADASIL." (Tr. 521). A motor examination revealed "normal" muscle tone and only "slight weakness" in terms of muscle strength. (Tr. 522). Plaintiff exhibited an antalgic gait due to pain in her right foot. (Tr. 522).

On December 26, 2007, Plaintiff provided a plasma sample for purposes of determining whether she suffered from any "disorders of cholesterol synthesis." (Tr. 537). The results of this examination were "normal." (Tr. 537).

On January 2, 2008, Plaintiff participated in an MRI examination of her thoracic spine the results of which revealed: (1) "small central disc herniation" at T2-3; (2) "small right paracentral disc herniation...at T10-11 resulting in mild impingement of the exiting right T10 nerve root"; (3) "mild degenerative disc disease throughout the thoracic spine"; and (4) "small left paracentral disc herniation" at T6-7. (Tr. 466). Plaintiff also participated in an MRI examination of her lumbar spine the results of which revealed: (1) "right foraminal disc herniation" at L4-5 which "impinges on the exiting L4 and descending L5 nerve roots"; (2) degenerative disc disease at L3-4 and L5-S1; and (3) degenerative joint disease at L4-5. (Tr. 466-67).

On June 18, 2008, Plaintiff participated in an MRI examination of her brain the results of which revealed evidence that Plaintiff was suffering from inflammatory disease. (Tr. 391).

On July 11, 2008, Plaintiff was examined by Dr. Yasushi Kisanuki. (Tr. 474-78). The doctor reported that the "main reason" for this examination was an "evaluation of the spells" which Plaintiff was experiencing. (Tr. 474). Specifically, Plaintiff reported that on two occasions in the preceding month she experienced "spells" in which she "felt like she [was] going to lose her consciousness. (Tr. 474). Each of these spells lasted several minutes during which time she also experienced "some tightness in her chest." (Tr. 474-75). The doctor concluded that Plaintiff was suffering from leukodystrophy. (Tr. 477).

On November 27, 2008, Plaintiff was examined by Dr. Kisanuki. (Tr. 574-76). The results of a neurological and cranial nerve examination were unremarkable. (Tr. 575). Plaintiff

exhibited "normal" muscle tone "throughout" and with the exception of the interossei muscles in her hands and the right extensor hallucis longus muscle, Plaintiff exhibited 5/5 muscle strength. (Tr. 575). The results of a sensory examination revealed "significant impairment in pinprick sensation" and a coordination exam revealed that Plaintiff "has slightly slowed fine finger movements without ataxia or dysmetria." (Tr. 575). An evaluation of Plaintiff's gait revealed that "her base is narrowed and her stride is normal range and she can walk on the heels and toes [and] she can walk in tandem fashion without difficulty." (Tr. 575). The doctor concluded that Plaintiff was experiencing "peripheral polyneuropathy affecting [her] bilateral lower extremities." (Tr. 575).

On December 16, 2008, Plaintiff participated in a nerve conduction study of her lower extremities the results of which were "normal" with "no evidence of radiculopathy, peripheral neuropathy nor focal neuropathy." (Tr. 599-601). The examiner further observed that "the results of this study do not explain the patient's current symptoms complex." (Tr. 601).

Treatment notes dated January 22, 2009, indicate that Plaintiff was experiencing "secondary hyperparathyroidism due to Vitamin D deficiency" for which "Vitamin D replacement therapy" was initiated. (Tr. 652-53).

On January 29, 2009, Plaintiff was examined by Dr. Scarlett. (Tr. 720-21). An examination of Plaintiff's extremities were within normal limits, but an examination of her lumbosacral spine was "positive [for] pain and tenderness to palpation over L3-L5 and S1 with decreased [range of motion] in all spheres." (Tr. 720).

At the Administrative Hearing, Plaintiff testified that she experiences dizzy spells on a "daily basis" and that if she does not lay down she "will end up blacking out." (Tr. 38-42). Plaintiff testified that she is "in pain every day" from her neck through her lower back. (Tr. 42-43).

Plaintiff reported that she is not able to be on her feet "for long periods of time" because she has "a tendency of falling." (Tr. 44-45). Plaintiff also reported that she is unable to stand in one place or sit for long periods of time. (Tr. 45). Plaintiff reported that she experiences problems using both of her hands and experiences difficulty even lifting a glass of water. (Tr. 46). Plaintiff testified that she experiences difficulty sleeping "sometimes" as a result of the pain she experiences. (Tr. 47-48).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[5] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable

---

[5] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from: (1) degenerative disc disease of the lumbar spine; (2) multiple sclerosis; (3) a seizure disorder; (4) leukoencephalopathy; (5) hypothyroidism; (6) gastroesophageal reflux disease (GERD); and (7) an affective disorder, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 18-21).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform simple, unskilled sedentary work subject to the following limitations: (1) she can lift/carry ten pounds occasionally and less than 10 pounds frequently; (2) she can stand and walk for two hours during an 8-hour shift; (3) she can sit for six hours during an 8-hour shift; (4) she requires a sit-stand option that enables her to change position every 30-45 minutes; (5) she cannot climb ladders, ropes, or scaffolds; (6) she can only occasionally stoop, crouch, kneel, crawl, or squat; (7) she can frequently, but not constantly, perform handling or fingering activities; and (8) she cannot work with dangerous machinery or at unprotected heights. (Tr. 21-22). With respect to Plaintiff's non-exertional impairments, the ALJ further concluded that

11

Plaintiff cannot perform work that requires: (1) concentration on detailed, precision, or simultaneous tasks; (2) reading, computing, calculating, problem solving, or reasoning; (3) more than minimal contact with, and direction from, a supervisor; (4) frequent significant changes or adaptations; or (5) meeting production quotas or goals or keeping pace with co-workers. (Tr. 22). The ALJ, based on testimony from a vocational expert, found that there existed a significant number of jobs that Plaintiff could perform consistent with her limitations. (Tr. 23-25). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### a. The ALJ Properly Evaluated the Medical Evidence

Plaintiff asserts that the ALJ failed to accord controlling weight to opinions expressed by Douglas Ruben, Ph.D., one of her treating physicians. The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial

medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544. In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544. The ALJ is not required, however, to explicitly discuss each of these factors. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007). Instead, the record must reflect that the ALJ considered those factors relevant to his assessment. *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

On an unspecified date, Dr. Rubens completed a form concerning Plaintiff's level of impairment in several non-exertional areas of functioning. (Tr. 659). The doctor reported that Plaintiff experienced "marked" limitations in the following areas of functioning: (1) the ability to understand and remember detailed instructions; (2) the ability to maintain attention and concentration for extended periods; and (3) the ability to work in coordination with or proximity to others without being distracted by them. (Tr. 659). Dr. Rubens also reported that Plaintiff was "moderately" limited in the following areas: (1) the ability to remember locations and work-like procedures; (2) the ability to carry out detailed instructions; and (3) the ability to perform activities

13

within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 659). Plaintiff asserts that because these "opinions" are inconsistent with the ALJ's RFC determination, the ALJ was required to either afford controlling weight to Dr. Rubens' opinions or articulate good reasons for not doing so. As the ALJ did neither, Plaintiff asserts she is entitled to relief.

The error in Plaintiff's argument is the doctor's completion of the form in question does not constitute a medical "opinion" to which the ALJ must defer. A medical opinion is defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite impairment(s), and [her] physical or mental restrictions." *Simpson v. Commissioner of Social Security*, 344 Fed. Appx. 181, 194 (6th Cir., Aug. 27, 2009) (quoting 20 C.F.R. §§ 404.1527(a)(2) and 416.972(a)(2)).

Dr. Rubens did not provide a statement concerning what he believed Plaintiff could do despite her impairments and limitations. Rather, the doctor simply checked a box on a form. The form, however, does not indicate the intended definition of the terms "marked" or "moderately." Likewise, Dr. Rubens failed to provide any definition of these terms or otherwise provide any detail or insight regarding this particular form or his completion thereof. While the Court recognizes that an individual with a "marked" or "moderate" limitation in a given area of functioning is experiencing a diminution in functional capacity, absent any indication or suggestion as to how the evaluator defines "marked" or "moderate," the significance of such is difficult to discern and certainly does not qualify as an "opinion" to which the ALJ must defer. The Court, therefore, discerns no error in the ALJ's failure to specifically address the form which Dr. Rubens completed.

    b. The ALJ Improperly Discounted Plaintiff's Subjective Allegations

As described above, Plaintiff testified at the administrative hearing that she was impaired to an extent well beyond that recognized by the ALJ. The ALJ concluded that Plaintiff's subjective allegations "are not fully credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 22). Plaintiff asserts that the ALJ improperly discounted her subjective allegations.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added); *see also*, *Grecol v. Halter*, 46 Fed. Appx. 773, 775 (6th Cir., Aug. 29, 2002) (same). As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled." 20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)) *Hash v. Commissioner of Social Security*, 309 Fed. Appx. 981, 989 (6th Cir., Feb. 10, 2009). Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). This standard is often referred to as the *Duncan* standard. *See Workman v. Commissioner of Social Security*, 105 Fed. Appx. 794, 801 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may

15

support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony"). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

In rejecting Plaintiff's subjective complaints, the ALJ concluded that Plaintiff's "allegations of a seizure disorder appear overstated, as medical evidence indicates this impairment has been controlled with medication over the past few years." (Tr. 22). Treatment notes dated July 11, 2008, however, indicate that Plaintiff was experiencing "spells." (Tr. 474-78). One year later, Plaintiff testified that she continued to experience such "spells." (Tr. 38-42). The Court notes that Plaintiff's care providers have not questioned Plaintiff's veracity or otherwise called into question her subjective allegations or descriptions of her symptoms.

The ALJ also stated that Plaintiff's condition "appears to be generally stable." (Tr. 22). In support of this vague statement, the ALJ relies on a single, isolated examination of Plaintiff that occurred in June 2008. (Tr. 19-20, 22-23, 487-91). As previously noted, Plaintiff suffers from a degenerative brain condition the progression of which "is generally uneven, with periods of relative stability interrupted by episodes of rapid decline." Given such, the ALJ's reliance on the results of a single examination is suspect. The medical evidence, evaluated as a whole, reveals that while Plaintiff may not have experienced episodes of *rapid* decline, her overall condition has deteriorated with the passage of time.

The ALJ also concluded that Plaintiff's statements and reported activities did not support her claim for benefits. (Tr. 23). In December 2006, Plaintiff reported that she was able to prepare meals, wash dishes, dust, vacuum, and wash laundry. (Tr. 181). She also reported that she enjoyed reading, knitting, and crocheting. (Tr. 183). In July 2009, however, Plaintiff reported that her ability to function and perform activities had greatly diminished. (Tr. 38-48). This is consistent with the medical evidence and the deteriorating nature of Plaintiff's impairments. Again, the Court notes that Plaintiff's care providers have not questioned Plaintiff's veracity or otherwise called into question her subjective allegations or descriptions of her symptoms. Furthermore, with respect to Plaintiff's allegations regarding her back pain and resulting limitations, the objective medical record establishes the presence of disc herniations resulting in nerve root impingement which certainly support her subjective allegations.

In sum, for the reasons articulated above, the Court finds that there does not exist substantial evidence to support the ALJ's decision to discredit Plaintiff's subjective allegations of pain and limitation.

      c.  The ALJ's RFC Determination is Not Supported by Substantial Evidence

    The ALJ's RFC determination is largely premised on his rejection of Plaintiff's subjective allegations. As discussed above, however, substantial evidence does not support the ALJ's decision in this regard. Moreover, the objective medical evidence concerning Plaintiff's back impairments and degenerative brain condition indicate that she is impaired to an extent beyond that recognized by the ALJ. The Court offers no opinion as to Plaintiff's residual functional capacity, as determination of such is beyond the authority and skill of this Court, but instead simply concludes that the ALJ's RFC determination is not supported by substantial evidence.

    The vocational expert testified that given Plaintiff's RFC, there existed a significant number of jobs which Plaintiff could perform despite such limitations. However, the ALJ's RFC determination is not supported by substantial evidence. Because the vocational expert's testimony was premised upon a faulty RFC determination, the ALJ's reliance thereon does not constitute substantial evidence. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996) (while the ALJ may rely upon responses to hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments).

    As detailed herein, the Court finds that the ALJ's decision fails to comply with the relevant legal standards. However, Plaintiff can be awarded benefits only if proof of her disability is "compelling." *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits if all essential factual issues have been resolved and proof of disability is compelling). While the ALJ's decision fails to comply with the relevant legal standard, there does not exist *compelling* evidence that Plaintiff is disabled. As discussed herein, adjudication of Plaintiff's claim requires the resolution of factual

disputes which this Court is neither authorized nor competent to undertake in the first instance. Accordingly, the Court concludes that the Commissioner's decision must be reversed and this matter remanded for further factual findings.

## CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision is not supported by substantial evidence. Accordingly, the Commissioner's decision is **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**. A judgment consistent with this opinion will enter.


Date:  March 27, 2012                                      /s/ Ellen S. Carmody
                                                          ELLEN S. CARMODY
                                                          United States Magistrate Judge